IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 11, 2007 Session

## STATE OF TENNESSEE v. JUSTIN BRADLEY HAYNIE, JONATHAN ANTHONY MORRIS, and JUDSON F. OUZTS

**Appeal from the Circuit Court for Lauderdale County**
**No. 7941    Joseph H. Walker, III, Judge**

-----

**No. W2006-01840-CCA-R3-CD  - Filed December 7, 2007**

-----

A jury convicted the Defendants, Justin Bradley Haynie, Jonathan Anthony Morris, and Judson F. Ouzts, of one count of possession of over .5 grams of cocaine with the intent to deliver, a Class B felony, and one count of possession of alprazolam with the intent to deliver, a Class D felony. Defendants Haynie and Morris were both sentenced to eight years and ten months for the cocaine conviction and to a concurrent, two-year sentence for the alprazolam conviction. Defendant Ouzts was sentenced to eight years for the cocaine conviction; in all other regards, his sentence was the same. Each Defendant was ordered to complete his sentence through the Community Corrections Program after serving part of the sentence in the county jail. In this appeal, the Defendants collectively raise three issues: (1) whether the trial court erred by denying the Defendants' pretrial motions to suppress the evidence recovered from a search of Defendant Ouzts's vehicle; (2) whether the evidence was sufficient to support their convictions; and (3) whether the State's closing argument was improperly prejudicial. Defendant Ouzts raises two additional issues: (1) whether the trial court erred in allowing testimony amounting to a legal conclusion; and (2) whether a juror's bias required a new trial. Following our review, we affirm the judgments of the trial court on the cocaine convictions, but we reverse the judgments entered on the alprazolam convictions and remand for resentencing and proceedings consistent with this opinion.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Reversed in Part; Remanded

DAVID H. WELLES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Scott Lovelace, Ripley, Tennessee, for the appellant, Justin Bradley Hanie; Kari Weber, Assistant Public Defender, Somerville, Tennessee, for the appellant, Jonathan Anthony Morris; and Rebecca S. Mills, Ripley, Tennessee, for the appellant, Judson F. Ouzts.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Michael Dunavant, District Attorney General; and Tracey Brewer-Walker, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

On December 2, 2005, the Defendants, who were all traveling in the same vehicle, were stopped by an officer with the Ripley Police Department. The vehicle was searched, and illegal drugs were discovered inside. Subsequently, a Lauderdale County Grand Jury indicted each Defendant with one count of possession with the intent to deliver .5 grams or more of cocaine, and one count of possession of a Schedule IV drug (alprazolam) with the intent to deliver. The Defendants filed pretrial motions to suppress the evidence obtained during the search, and the trial court held an evidentiary hearing.

### Suppression Hearing

At the hearing, Chris Shoemake, a Trooper with the Tennessee Highway Patrol, testified that his father owns Lynnwood's Market in Lauderdale County, where he works part time. On December 2, 2005, Trooper Shoemake and his sister, Angie Phillips, were working at the store. At approximately 10:30 a.m., Ms. Phillips alerted him to what she thought was "suspicious" activity taking place in the store's parking lot. Trooper Shoemake immediately instructed her to call the police. While she was making the call, he monitored the activity in the parking lot by looking through the store's front window. At the pretrial suppression hearing, he described his observations:

> I saw two white males exit a white Ford vehicle that was parked in front of the store and get into the backseat of a burgundy vehicle driven by one black male. When they got in the back seat area, I saw hands exchanged back and forth but did not see anything in their hands because it was too far out in the parking lot to see any particular item.
> They exited the vehicle. The driver of the white Ford vehicle, when he stepped out of the vehicle, was holding his hand over his right pocket, shirt pocket—his left shirt pocket with his right hand, and they got back into the vehicle. The burgundy vehicle left the parking lot, and a few minutes later they also left.

Trooper Shoemake said that there was a third person in the backseat of the white Ford Expedition who did not exit the vehicle, but he did not recognize any of the white males or the person driving the burgundy car. The driver of the white Ford Expedition was wearing a "blue-checkered shirt" and the passenger was wearing "a brown-colored coat." When he saw the "hand-to-hand exchange" that occurred in the burgundy car, the white male wearing the blue-checkered shirt was the individual whose "hands exchange[d] back and forth." It was a clear day, and nothing impeded Trooper Shoemake's sightline.

-2-

"[J]ust a few seconds" after the white Ford Expedition left the parking lot, a local police officer, Investigator Gregg Land, arrived at the store in response to Ms. Phillips's call. Trooper Shoemake knew Investigator Land and other members of the Ripley Police Department personally. Trooper Shoemake gave "him the vehicle descriptions in question, and [Investigator Land] left the premises there just immediately." Specifically, the State and Trooper Shoemake had the following exchange at the hearing about the information Trooper Shoemake conveyed to Investigator Land:

> Q. And did you advise him of what you saw?
>
> A. Not at that point I did not. I advised him of the vehicles in question.
>
> Q. Okay. Can you be specific of what you told Investigator Land?
>
> A. Investigator Land asked me which vehicle it was, and I told him it was the white Ford Expedition that just left the parking lot, and he immediately left the scene.

Trooper Shoemake did not identify any of the suspects that day. On cross-examination, Trooper Shoemake confirmed that the store's parking lot was a public area and that it was not a criminal action to park there and "visit" with another person. He also stated that the white males were in the burgundy car for only "[t]en or fifteen seconds" and that Investigator Land was in the store's parking lot for "probably three or four seconds, just long enough for me to give him a description of the vehicle." According to Trooper Shoemake, when Investigator Land "took off after the truck," he was "operating on a description of the vehicle only and the direction it was headed."

Investigator Gregg Land of the Ripley Police Department testified that he had worked as a "drug investigator" for approximately eight years. He said that on December 2, 2005, his dispatcher alerted him to a "complaint from Lynnwood's Market about two white males and a black male subject involved in a hand-to-hand drug transaction." Investigator Land was in the police station at the time, and he "actually answered the phone and spoke to Ms. Phillips for just a brief second or two, exited the police department and headed to Lynnwood's Market."

After Investigator Land traveled the two miles from the police station to Lynnwood's Market, he saw Trooper Shoemake, whom he knew personally, standing outside. As Trooper Shoemake was "attempting to give [him] a better vehicle description," the white Ford Expedition "went back by" the store, and Trooper Shoemake said, "[t]here goes the vehicle right there." At that time, it was the only vehicle on the road. Investigator Land left the store's parking lot, activated his cruiser's blue lights and siren, and pulled the white Ford Expedition over approximately two blocks away from Lynnwood's Market.

Investigator Land called for assistance, and as he was talking with the driver of the white Ford Expedition (Defendant Ouzts), three uniformed officers arrived to assist him, Sergeant Chris Bailey, Patrolman Jimmy Drake, and Officer Joey Rhea. Investigator Land knew Defendant Ouzts

"from prior complaints." Investigator Land first explained to Defendant Ouzts why he had pulled him over and then asked for permission to search the vehicle. According to Investigator Land, Defendant Ouzts granted permission for a search but said that "if [Investigator Land] found anything, it didn't belong to him."

Defendant Ouzts was the registered owner of the vehicle, and there were two passengers inside at the time of the stop: Defendant Haynie was seated in the front passenger seat, and Defendant Morris was seated in "the right rear seat." Investigator Land confirmed that the three men were not free to leave during the search.

Investigator Land informed that Sergeant Bailey and Officer Rhea searched the vehicle, and the latter found "a large amount of cocaine, along with nineteen tablets of [a]lprazolam" located in the vehicle's "center console, inside a CD changer, or underneath a CD changer." The Defendants were arrested and transported to the police station where they all gave statements.

Initially, Defendant Haynie would only state, "I don't have anything to say. The shit's not mine." Later however, after Defendant Haynie had been arrested for another, unrelated offense (theft of a vehicle), he asked to speak with Investigator Land and said that Investigator Land knew to whom the drugs belonged. In that videotaped interview, he repeated his initial statement, and "he basically rambled on . . . that it wasn't his, but never would indicate . . . who [the drugs] belonged to."

Defendant Ouzts stated that he did not know any drugs were in his car and that he never saw either of the two passengers put anything in the center console. The reason that he stopped at the Lynnwood Market was "to get something to drink." Asked if he spoke with anyone at the store, Defendant Ouzts said that he says "hey to everybody [he] see[s]." He also stated that Defendant Haynie talked to "some guy" (whose name might have been "Payne") in a "maroon car with rims on it." He explained that Defendant Haynie and this individual discussed "some dogs or something." Initially, Defendant Ouzts stated that, at some point, he got in the backseat of the maroon car with Defendant Haynie and "Payne," but he later corrected his statement and asserted that he only opened the "back door and [gave] a small child five."

While at the police station with Investigator Land, Defendant Morris admitted that he used marijuana but contended that he did not know to whom the drugs in Defendant Ouzts's vehicle belonged. However, he saw Defendant Haynie put the drugs in the center console after the police "got behind" them. The reason they stopped at Lynnwood's Market was because Defendants Ouzts and Haynie "saw some guy but didn't know his name." The "guy" was driving a maroon car. Defendant Morris also confirmed that Defendants Ouzts and Haynie got into the backseat of the maroon car.

On cross-examination, Investigator Land confirmed that he stopped Defendant Ouzts's car "pursuant to the information supplied to [him] by [Trooper] Shoemake" and that the Defendants had not violated any traffic law. No contraband was in plain view when he initially spoke with

-4-

Defendant Ouzts at the open driver's-side window nor was there any odor of drugs. Upon further questioning about why he stopped Defendant Ouzts's car, Investigator Land stated that his "information was that a trained law-enforcement officer observed a drug transaction." On redirect examination, he explained that he had received this information from the dispatcher and affirmed that he "followed that up with a description from Trooper Shoemake."

Officer Joey Rhea, also of the Ripley Police Department, testified at the hearing that he assisted Investigator Land with the stop of Defendant Ouzts's vehicle and witnessed Defendant Ouzts consent to the search. Officer Rhea discovered the drugs after opening the center console and then opening the compact disc changer. The drugs were not in plain view but were packaged in two clear plastic bags. The Defendants were handcuffed after the drugs were discovered.

The Defendants did not introduce any evidence at the suppression hearing. After hearing argument, the trial court overruled the Defendants' motions to suppress the evidence recovered from the search of Defendant Ouzts's vehicle:

> The [c]ourt find[s] that the stop was a constitutional stop, that the officer had probable cause supported by specific and articulable facts to believe that an offense had just been committed; he had reasonable suspicion to investigate further; that the information received was presumed reliable.
> Once the vehicle was stopped, the only proof before me is that the consent was voluntarily given, and the search resulted in finding illegal substances or what the State alleges are illegal substances in the CD changer, and the motion to suppress the drugs is denied.
> Considering the totality of the circumstances, the taking of the statements, the [c]ourt didn't hear any reason to suppress any part of the statements or to suppress the statements, with the exception of [Defendant] Morris's. Should the State decide to use the statement in its case-in-chief, the [c]ourt would grant [Defendant Morris's] request to redact the information in there about use of drugs.

Defendant Ouzts's request for an interlocutory appeal of the trial court's ruling was also denied.

**State's Case-in-Chief**

At the Defendants' jury trial, Officer Rhea testified that there were three police officers present when he arrived at the location where the white Ford Expedition was stopped, that none of their guns were drawn, and that he heard Defendant Ouzts grant Investigator Land permission to search the Ford Expedition. He searched the vehicle and recovered a "white powder substance known to be crack cocaine in a CD holder inside the console along with some pills." According to Officer Rhea, the drugs were "within reach" of all three of the Defendants.

Officer Rhea also testified that, in his experience as a police officer, he had previously participated in the seizure of narcotics and "narcotic-type paraphernalia," as well as the arrest of

individuals for illegal narcotic activity, between sixty-five and one-hundred times. He had participated in the execution of fifty search warrants "pertaining to narcotics or narcotic-type paraphernalia." More specifically, he testified that he had been involved in the arrest of individuals in possession of "small, little bitty bags to great big old bags."

In the cases where subjects were arrested with larger amounts, Officer Rhea charged them with possession with the intent to deliver. In his opinion, the Defendants in the present case had a "large amount."

On cross-examination, when questioned whether the cocaine he found was "crack" cocaine or cocaine powder, Officer Rhea clarified that it was powder cocaine. However, he could not recall whether any paraphernalia was recovered with the drugs, but he agreed that none would be needed to consume pills. He further testified that an identification card, or "just about anything" could be used to "scrape [cocaine powder] out or smooth it out." He did not remember finding any digital scales or "baggies" in the car nor did he discover any pagers. Officer Rhea said that one of the Defendants had a cellular telephone, but he could not remember to whom it belonged. He also confirmed that there was $1,800 in cash in the car and a "withdrawal slip" from the Bank of Ripley for $2,000.

Jessica Lynn Marquez, a forensic scientist with the drug chemistry section of the Tennessee Bureau of Investigation, testified as an expert in the field of identification of drugs. She confirmed that the white powdery substance recovered from Defendant Ouzts's car was 2.7 grams of cocaine, a Schedule II drug. The other bag contained eighteen and one-half tablets of alprazolam, a Schedule IV drug. According to Marquez, cocaine powder can be snorted, smoked or injected.

Trooper Shoemake testified that in the course of his training and activities as a law enforcement officer, he had been involved in suspected drug transactions "a few times" and explained that on the day in question, he and his sister were working at their father's store, the Lynnwood Market. His sister alerted him to suspicious activity taking place in the parking lot; he instructed her to call the police, and then he watched out the store's front window. He then provided essentially the same testimony that he gave at the suppression hearing regarding what he observed in the parking lot: the suspicious hand-to-hand exchange which occurred between the driver of the maroon car and one of the two individuals that had exited the white Ford Expedition and got into the backseat of the maroon car.

Trooper Shoemake was "30 to 50 feet" from the maroon vehicle. He identified Defendant Ouzts as the white male directly involved in the exchange and said he had been wearing a blue-checkered shirt and was the driver of the Ford Expedition. After Defendant Ouzts exited the maroon car, Trooper Shoemake saw him covering a "bulge" in his shirt pocket with his hand. Trooper Shoemake also identified Defendant Haynie as the individual who had been wearing the brown coat and returned to the front-passenger's seat of the Ford Expedition. He could not identify the third individual who stayed in the backseat of the Ford Expedition.

Asked why he thought their activity was suspicious, Trooper Shoemake testified that it was "[t]he way they were acting. They were being real suspicious looking around, and they just—that's what I based my suspicion on that something was going on."

According to Trooper Shoemake, the maroon car left the parking lot, and then the Ford Expedition departed. Shortly thereafter, Investigator Land arrived, and while Trooper Shoemake was talking with him, the white Ford Expedition drove by again.

Investigator Land testified at the trial that he had worked in law enforcement investigating drug crimes for the previous nine years and that he had "probably received somewhere between four and five hundred hours of training over [his] career thus far in all aspects of drugs." He had also participated in the undercover delivery of cocaine, methamphetamine, marijuana and illicit prescription narcotics. In addition, he testified that he had been involved in the execution of "probably 250 to 300" search warrants pertaining "to narcotics or paraphernalia."

Investigator Land explained why he pulled the Defendants over, stating that the stop was "[i]nitially based on a citizen complaint. Then after speaking with [Trooper] Shoemake for a brief moment, getting a better description, I stopped the vehicle based on his observation of what he considered to be a drug transaction between two individuals in the parking lot of his father's store." He confirmed that he had assistance from other officers during the stop and said that Officer Rhea actually recovered the drugs and turned them over to him. At that time, he suspected that the substances were cocaine and alprazolam. Investigator Land clarified that he normally referred to alprazolam as "Xanax."

Investigator Land testified that no paraphernalia associated with the use of powder cocaine was discovered in the vehicle. Asked whether he had drawn any conclusion regarding "whether or not those particular narcotics were being possessed with any intent," Investigator Land responded that "[t]o my investigation and training, there was no doubt in my mind that this was for resale. Like I said, I never found any paraphernalia to use any of these items." He further informed that normally undercover "buys" were for amounts of cocaine ranging from .1 to .5 grams.

Regarding the cocaine recovered in the present case, Investigator Land testified that it was "[b]y no means" a small amount. Further, he stated that the cocaine had "not been ground down, and it's kind of hard. It hadn't been chopped or ground or—I don't know what the purity level of this cocaine is. It could be—I mean, a cut be used [sic] to make it twice this amount as far as I know." Asked how someone could break the cocaine down, he explained as follows:

> Oh, there's numerous ways. You can take pill grinders, or they actually make little grinders like little tiny coffee grinders or take a razor blade and chop those chunks up into a fine powder, then cut it with another inexpensive powder like vitamin B or Enfamil or something like that.

Investigator Land opined that based on where the Defendants were sitting in the vehicle, any one "of those three gentlemen could easily have placed those drugs in the console of that truck." Investigator Land also detailed the statements the three Defendants gave at the police station that day, as he had done at the suppression hearing. He further stated that the Defendants' charges were based on what he had found in Defendant Ouzts's car—the amount of drugs they had and the fact that they did not possess any "paraphernalia to consume" the drugs. However, on cross-examination, he conceded that there was no "paraphernalia for selling" drugs or "delivery paraphernalia" discovered in the car either.

Investigator Land agreed that no digital scales, guns, pagers, "baggies," or cellular telephones were recovered in the search of Defendant Ouzts's car. Asked what kind of paraphernalia was required to take pills, he responded, "[s]imply a drink." He confirmed that he had seen people "chop up" cocaine with a driver's license and snort it by using a folded-up dollar bill as "a straw" and that Defendant Ouzts had a driver's license and money on him when he was arrested. Specifically, Defendant Ouzts had $1,806 on his person and a bank withdrawal slip in his name for $2,000. Defendant Morris did not have any money on him at the time of his arrest, and Defendant Haynie had either no money or "a very, very small amount."

**Defense Evidence**

Defendant Ouzts testified that he was twenty-two years old and worked for "Brad Chalk" installing siding in newly constructed houses and that he lived with his mother in Henning. He started using marijuana and alcohol when he was "about 19" and then cocaine and "Xanax" approximately one year later.

After he "received a lump sum check of $50,000" as a settlement payment for injuries he sustained in a car accident in June of 2005, he began using more cocaine and Xanax. He affirmed that he "kind of let [his] ego get ahead of [him] with this money," and in his small town, after he bought the white Ford Expedition, people started noticing him more.

On December 1, 2005, he picked up Defendants Haynie and Morris, who did not have cars, and they rode around "drinking and smoking . . . marijuana . . . all night." That morning, he took Defendant Morris to his house so he could take a shower, and then they all went to his mother's house where they "hung up a door" for his mother.

While they were at his mother's house, "there was a phone call made to [Defendant Ouzts] asking [him] if [he] wanted to buy some Xanax bars." Defendant Ouzts told the caller he wanted to buy the pills and arranged to meet him. When they left his mother's house, they went to the bank "to get some money for [his] mom 'cause she had said she was struggling for bills, so I went and got [$]2,000 out to give her." Defendant Ouzts could not remember the name of the person who sold him twenty pills of alprazolam for $80 but said "[t]hey called him Junior." After he sold Defendant Ouzts the pills, "Junior" arranged for him to meet another person who would sell him cocaine at Lynnwood's Market.

When they first arrived at Lynwood's Market, Defendant Ouzts bought bottled sports drinks for himself and his co-defendants. He said that he and Defendant Morris took between one-half and one alprazolam pill each and that he "imagined" Defendant Haynie also took a pill. When the seller arrived, Defendants Ouzts and Haynie got into his car and "talked to him about some pits" before buying "a ball of cocaine for $100." At that point, the three Defendants planned to drive to Memphis to pick up a repaired compact disc player for Defendant Ouzts's car.

Defendant Ouzts said that he was going to share the alprazolam pills with his co-defendants and that the twenty pills would last "a period of a day." He additionally planned to consume "[e]very bit" of the cocaine that day. He stated that the only paraphernalia they needed to use the pills was "a drink." He further explained how he could have used the cocaine: "Take it and put it in the dollar bill, and then you crush it up with the lighter. Then you can either get it lined on a CD case or you can take a little card and bend it and bump it." All of the items necessary (a dollar bill, a lighter, and a compact disc case) were available in his car. Defendant Ouzts testified that he was not going to sell the alprazolam or cocaine to anyone.

Defendant Ouzts stated he had $1,806 remaining from his $2,000 withdrawal because he had purchased the alprazolam, cocaine, sports drinks, and "probably" some gasoline and cigarettes. He also stated that, when they were first stopped by the police, he was scared because an officer approached on the passenger side of the vehicle, pulled his revolver, and said, "Where's the pistol at?" According to Defendant Ouzts, when it became apparent that they were being pulled over, Defendant Haynie took the cocaine out of a "cup holder" and placed it inside the compact disc player located within the center console. He admitted that he lied the day he gave his statement to Investigator Land when he said he did not know the drugs were in his car.

On cross-examination, he agreed that because he and his co-defendants had been driving around smoking marijuana and drinking the night before, they were "benefitting from these narcotics" after the drug transaction the next morning. He also answered in the affirmative when he was asked if "it was true that when all three of [the Defendants] would get around, [they] all would benefit from each other by smoking and getting high with these narcotics."

Renee Jackson, a nurse at the West Tennessee State Prison, testified that Defendant Ouzts was her son and that he lived with her. She informed that she suspected her son starting using drugs when he was nineteen, when he was going through a period of "severe depression." At various times, she found empty "baggies," straws and bent playing cards in his bedroom that she associated with drugs. His drug use escalated after he received the insurance settlement, and he developed addiction problems. However, according to Ms. Jackson, he never sold drugs.

Sheri Mitchell testified that she worked for the Bank of Ripley and was the custodian of certain records relating to savings and checking accounts. On November 7, 2005, Defendant Ouzts deposited a check from State Farm Insurance for $50,000. On December 2, 2005, he withdrew $2,000 "around" 10:00 a.m., and his account balance on that date was $20,330.75.

Defendant Morris testified that he was nineteen years old at the time of the offenses. He was using marijuana and "Xanax" that day. The night before he and his co-defendants were arrested, they were "[r]iding around and drinking and smoking" marijuana. The next morning, they went by his house so he could take a shower and change clothes; then they went to Defendant Ouzts's house where they "helped put a door up for [Defendant Ouzts's] mother." After they left Defendant Ouzts's house, he rode with his two co-defendants to the bank and then to a location "[d]own the street" from Defendant Haynie's house where a man got inside the car with them and sold Defendant Ouzts the alprazolam pills. Following the purchase, Defendant Morris took either one-half or an entire alprazolam pill.

From there, they went to Lynwood's Market where Defendants Ouzts and Haynie got out of the car and talked with a man in the car behind them. When they got back inside Defendant Ouzts's car, there was no discussion about cocaine. Investigator Land stopped them "maybe five minutes" after they left the store. Defendant Morris did not know about the cocaine until Investigator Land was pulling them over. His plan for that day was to go to Memphis with Defendant Ouzts so he could "get his CD player," but they were not going to deliver or sell the drugs to anyone.

Marcus Keely testified that he was Defendant Ouzts's bail bondsman and that Defendant Ouzts told him that he had purchased the drugs.

Defendant Haynie did not testify.

On redirect examination, Investigator Land testified that "at no time did any officer draw a weapon on any" of the three Defendants. Further, he informed that the average price of cocaine in the State of Tennessee was "$100 a gram" and that in his nine years of experience, he had never "known $100 to buy 2.7 grams of cocaine." Asked whether individuals who buy narcotics are able to "turn around and resell those narcotics or deliver them to other individuals," he answered, "Yes, they can. The whole drug trade is to make money."

Following closing arguments and deliberation, the jury convicted all three Defendants of possession of more than .5 grams of cocaine with the intent to deliver and possession of alprazolam with the intent to deliver. In addition, the jury fined each Defendant $25,000 for the cocaine conviction and $15,000 for the alprazolam conviction.

**Analysis**
## I.      Motions to Suppress
On appeal, the Defendants argue that the trial court erred by denying their pretrial motions to suppress the evidence (cocaine and alprazolam) recovered during the search of Defendant Ouzts's

automobile.[1]  Essentially, the Defendants contend that their constitutional right to be free from unreasonable seizures was violated because Investigator Land did not possess either reasonable suspicion or probable cause to stop the vehicle in which they were traveling.  As such, they assert that the evidence discovered as a result of the ensuing search should have been suppressed.  The State counters that Investigator Land had reasonable suspicion, supported by specific and articulable facts provided by a citizen informant, to stop their vehicle and therefore that no constitutional infringement took place.

## Standard of Review

In State v. Odom, 928 S.W.2d 18 (Tenn. 1996), our supreme court set out the standard of review this Court uses in reviewing a trial court's ruling on a motion to suppress evidence:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.  The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable inferences that may be drawn from that evidence.  So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.  In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

Id. at 23; see also State v. Dych, 227 S.W.3d 21, 37 (Tenn. Crim. App. 2006).  However, we review the trial court's application of the law to the facts de novo, without affording legal conclusions a presumption of correctness.  Dych, 227 S.W.3d at 37 (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)); see also State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).  In addition, when a trial court's findings of fact are based entirely on evidence not involving issues of witness credibility, "appellate courts are as capable as trial courts of reviewing the evidence and drawing conclusions," so those findings of fact are subject to de novo review.  State v. Eric Berrios, 235 S.W.3d 99, 104 (Tenn. 2007) (citing State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000)).

## Reasonable Suspicion

A warrantless search or seizure conducted by state officials is proscribed by the Fourth Amendment[2] to the United States Constitution, as well as article I, section 7 of the Tennessee Constitution,[3] and the resulting evidence is subject to suppression unless the State demonstrates by

---

[1] Although the three Defendants are each represented by separate lawyers on appeal, the briefs they submitted for our review are nearly identical on each of the three issues raised collectively.

[2] The Fourth Amendment to the United States Constitution applies to Tennessee authorities by operation of the Fourteenth Amendment to the United States Constitution.  See Mapp v. Ohio, 367 U.S. 643, 655 (1961).

[3] Our constitution states as follows:

(continued...)

a preponderance of the evidence that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. State v. Cox, 171 S.W.3d 174, 179 (Tenn. 2005); State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997); State v. Watkins, 827 S.W.2d 293, 295 (Tenn. 1992).

One well-established exception to the warrant requirement was created by the United States Supreme Court in Terry v. Ohio, 392 U.S. 1, 21 (1968). State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). In Terry v. Ohio, the high court "held that a law enforcement officer may temporarily seize a citizen if the officer has a reasonable suspicion, based upon specific and articulable facts, that a criminal offense has been, is being, or is about to be committed." Id. The facts presented in a particular case may be sufficient to establish reasonable suspicion but insufficient to establish probable cause:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990); see also State v. Pulley, 863 S.W.2d 29, 29–34 (Tenn. 1993) (providing a thorough and detailed explanation regarding the quantum of proof necessary to establish reasonable suspicion to support an investigatory stop in the context of an anonymous informant's tip).

An automobile stop constitutes a seizure within the meaning of both the federal and Tennessee constitutions; however, a police officer may make an investigatory stop of an automobile based on reasonable suspicion supported by specific and articulable facts "that an occupant is violating or is about to violate the law." State v. Luke, 995 S.W.2d 630, 635 (Tenn. Crim. App. 1998) (citing Watkins 827 S.W.2d at 294)) (other citations omitted). However, the specific "facts forming the basis of an officer's reasonable suspicion need not rest upon the personal knowledge or observation of the officer," Keith 978 S.W.2d at 865 (citing Adams v. Williams, 407 U.S. 143, 147 (1972)), but rather, the reasonable suspicion can be provided through an informant's tip. State v. Simpson, 968 S.W.2d 776, 781 (Tenn. 1998).

---

[3] (...continued)
That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offenses are not particularly described and supported by evidence, are dangerous to liberty and ought not be granted.

Tenn. Const. art. I, § 7.

To determine whether reasonable suspicion exists to support an investigatory stop, "our supreme court has distinguished between information provided by a known citizen informant and that obtained from a criminal or professional informant." Luke, 995 S.W.2d at 636 (citing State v. Cauley, 863 S.W.2d 411, 417 (Tenn. 1993)). Unlike information provided by a criminal informant, information provided to police by a citizen informant known to the officer, "is presumed to be reliable, and the prosecution is not required to establish either the credibility of the informant or the reliability of his information." Cauley, 863 S.W.2d at 417; see also State v. Ballard, 836 S.W.2d 560, 562 (Tenn. 1992).

In this case, Investigator Land based his stop of Defendant Ouzts's vehicle on information that was supplied to him by his dispatcher and Ms. Phillips, whom he testified that he spoke to on the telephone while at the police station. Because the record demonstrates that Ms. Phillips acted only as a concerned citizen and that Investigator Land knew she was an employee of Lynnwood's Market, she must be deemed a known citizen informant, and therefore any information she conveyed would be presumed reliable. See Luke, 995 S.W.2d at 637 (finding that a woman who called the police dispatcher and stated her name and that she was a clerk at a Holiday Inn before reporting a suspected drunk driver, was a known citizen informant whose information was presumed reliable).

The specific information Investigator Land received from his dispatcher and Ms. Phillips was that "two white males and a black male subject [were] involved in a hand-to-hand drug transaction" at Lynnwood's Market.

Moreover, although it is clear from the record that Trooper Shoemake did not directly relay his observations regarding the suspicious activity to Investigator Land when he arrived at Lynnwood's Market, Trooper Shoemake did confirm that a suspected drug transaction had occurred by immediately conveying to Investigator Land a description of one of the vehicles involved. Further, when that very vehicle drove back by Lynnwood's Market on an otherwise empty road, Trooper Shoemake alerted Investigator Land to it. Investigator Land knew Trooper Shoemake personally and therefore also knew that he was "a trained law enforcement officer." Accordingly, Investigator Land had no reason to doubt the accuracy of the confirmation provided by Trooper Shoemake or his identification of the subject vehicle. In our view, the brief encounter between Investigator Land and Trooper Shoemake added strength to the suspicion of Investigator Land that criminal activity was afoot.

Consequently, we conclude that Investigator Land acted with reasonable suspicion supported by specific and articulable facts supplied by his dispatcher, a known citizen informant, and an off-duty law enforcement officer that at least one of the occupants of the suspect vehicle was engaged in illegal activity when he activated his cruiser's blue lights and stopped Defendant Ouzts's vehicle. The Defendants do not challenge the validity of Defendant Ouzts's consent to the ensuing search. Therefore, the trial court did not err by admitting the evidence recovered.

## II.    Sufficiency of the evidence

Secondly, the Defendants argue that the evidence is insufficient to support their convictions. Defendants Haynie and Morris contend that the evidence was insufficient to establish that they were in possession of the drugs. Both Defendants stress the fact that they did not own the vehicle in which the drugs were discovered and the fact that Defendant Ouzts admitted to actually purchasing the drugs. Neither Defendant cites to any legal authority in support of his argument.

All three Defendants contend that "the State failed in its burden to show that the cocaine and alprazolam were possessed with intent to deliver." They collectively assert that "the State relied solely on the amount of the substances found without support of other relevant facts surrounding the arrest that could indicate intent to deliver." By highlighting the testimony of Defendants Ouzts and Morris and the fact that no physical evidence of the intent to sell or deliver was discovered in the car, the Defendants maintain that the State failed to prove they possessed the drugs with the requisite "intent to deliver."

### Standard of Review

Tennessee Rule of Appellate Procedure 13(e) mandates that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

In order to secure the Defendants' convictions in the present case, the State had to prove that they knowingly possessed the cocaine and alprazolam with the intent to deliver. See Tenn. Code Ann. § 39-17-417(a)(4).

**Constructive Possession**

Initially, we will address Defendants Haynie and Morris's arguments that the evidence was insufficient to establish that either of them was in possession of the cocaine or alprazolam at the time of their arrest.

The statute prohibiting possession of illegal drugs under which the Defendants were convicted, Tennessee Code Annotated section 39-17-417, is not confined "to proof of actual possession, and evidence of either constructive possession or other control over the substance is sufficient to establish this element" of the offense. State v. Ross, 49 S.W.3d 833, 845 (Tenn. 2001) (citing State v. Brown, 823 S.W.2d 576 (Tenn. Crim. App. 1991)). This Court has previously explained the nature of constructive possession:

> Before a person can be found to constructively possess a drug, it must appear that the person has the power and intention at a given time to exercise dominion and control over . . . [the drugs] either directly or through others. In other words, constructive possession is the ability to reduce an object to actual possession. The mere presence of a person in an area where drugs are discovered is not, alone, sufficient to support a finding that the person possessed the drugs. Likewise, mere association with a person who does in fact control the drugs or property where the drugs are discovered is insufficient to support a finding that the person possessed the drugs.

State v. Transou, 928 S.W.2d 949, 956 (Tenn. Crim. App. 1996) (quotations and citations omitted); see also State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001); State v. Brown, 915 S.W.2d 3, 7 (Tenn. Crim. App. 1995) (discussing the nature of constructive possession and finding that the driver\owner of a car from which the passenger tossed bags of cocaine constructively possessed the cocaine).

In the present case, Defendants Haynie and Morris were not merely present inside a car in which drugs were discovered, and they were not merely associated with a person who did in fact control the drugs. Rather, the record demonstrates that both Defendants were inside Defendant Ouzts's car in order to use the drugs at issue. Defendant Ouzts testified that, although he purchased the drugs, he would share them with his co-defendants. By his own admission, we know that Defendant Morris took some of the alprazolam soon after Defendant Ouzts purchased it. Further, in his statement on the day of their arrest, Defendant Morris informed that it was Defendant Haynie who put the cocaine inside the center console of the vehicle. At trial, Defendant Ouzts also testified that Defendant Haynie was the individual responsible for placing the cocaine inside the center console. Additionally, Defendant Ouzts's testimony indicated that Defendant Haynie had most likely also already taken some of the alprazolam when they were arrested.

Based on this record, we can only conclude that all three Defendants knew the location of the drugs inside the vehicle and had access to them. Viewing this evidence in the light most favorable to the prosecution, see Jackson, 443 U.S. at 319, this evidence is sufficient to support a finding that Defendants Haynie and Morris had constructive possession of the drugs inside

-15-

Defendant Ouzts's car: it is clear that any Defendant could have quickly taken actual possession of the drugs at any time before they were stopped. Although Defendant Morris testified that he did not know about the cocaine until they were being pulled over, the jury, by returning a verdict of guilty, did not accredit this testimony, and we will not reevaluate their credibility decisions on appeal. See Bland, 958 S.W.2d at 659.

**Intent to deliver cocaine**

Each Defendant argues that the evidence was insufficient to establish that they had the intent to deliver required by Tennessee Code Annotated section 39-17-417(a)(4). They assert that Defendant Ouzts testified that the cocaine was for his own personal use and that it was discovered in a single bag. They note that no paraphernalia associated with the distribution of drugs, such as a scale or additional "baggies," was discovered in the vehicle or on their persons. They also point to the testimony asserting that the "paraphernalia," or objects needed to use the cocaine and alprazolam, were located in the vehicle. Notwithstanding Investigator Land's firm opinion that the drugs were possessed for resale and Officer Rhea's testimony that 2.7 grams was a "large amount" of cocaine, the Defendants contend that "the State's proof did not rise to the level of sustaining a conviction for possession" with the intent to deliver.

The State argues that because the Defendants were arrested with 2.7 grams of cocaine, $1,800 in cash, and "no paraphernalia indicative of personal use," that the evidence was sufficient to sustain their convictions.

A specific mental state (such as intent to deliver) is an element of almost all criminal offenses, and it is proven most often by circumstantial evidence. State v. Timmy Lee Hill, No. M2005-01126-CCA-R3-CD, 2006 WL 1374668, at * 6 (Tenn. Crim. App., Nashville, May 17, 2006) (citing Hall v. State, 490, S.W.2d 495, 496 (Tenn. 1973)). Usually, the trier of fact must determine whether the culpable mental state was present by drawing inferences from the circumstances under which a defendant is arrested, id., and there are numerous factual scenarios from which a jury may properly infer that a defendant had the intent to deliver the drugs found in his possession. See State v. Toney L. Conn, No. M2005-02899-CCA-R3-CD, 2006 WL 3498048, at *5 (Tenn. Crim. App., Nashville, Nov. 21, 2006) (setting out the factual scenarios surrounding a defendant's possession of cocaine in eight different cases where this Court found the evidence sufficient to prove intent).

To prove intent in this case, the State relied in part on the trial court's instruction to the jury regarding Tennessee Code Annotated section 39-17-419. The statute states as follows:

> It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing. It may be inferred from circumstances indicating a casual exchange among individuals of a small amount of a controlled substance or substances that the controlled substance or substances so exchanged were possessed not with the purpose of selling or otherwise dispensing in violation of the provisions

of § 39-17-417(a). The inferences shall be transmitted to the jury by the trial judge's charge, and the jury will consider the inferences along with the nature of the substance possessed when affixing the penalty.

Tenn. Code Ann. § 39-17-419.


In essence, the evidence presented in this case showed: (1) the Defendants had 2.7 grams of cocaine contained in a single bag that was purchased from an individual in the parking lot of Lynnwood's Market minutes before they were arrested; (2) they also possessed eighteen and one-half tablets of alprazolam contained in a single bag that was also purchased that morning, and at least two of the three Defendants had already consumed some of the alprazolam; (3) Defendant Ouzts had $1,800 in cash that he had recently withdrawn from his own bank account; (4) they did not have any paraphernalia directly associated with the use or sale of cocaine; (5) Investigator Land testified that he was certain the Defendants intended to resell the cocaine, which was worth $270 and that because it was "hard," they could have used a cutting agent to increase the volume of cocaine before resale; and (6) Officer Rhea testified that the Defendants had a "large amount" of cocaine and that, in his opinion, they had the intent to deliver.

Viewed in a light most favorable to the State, we conclude that this evidence is sufficient to support the jury's finding that the Defendants possessed more than .5 grams of cocaine with the intent to deliver. Based on the amount of cocaine discovered in their possession (2.7 grams) and Investigator Land's informed testimony that it was worth approximately $270 and could have been broken down, increased in volume, and resold, a jury could conclude beyond a reasonable doubt that the Defendants had the intent to deliver the cocaine. See State v. William Martin Frey, Jr., M2003-01996-CCA-R3CD, 2004 WL 2266799, at *8 (Tenn. Crim. App., Nashville, Oct. 6, 2004) (holding that the evidence was sufficient to sustain the defendant's conviction for possession of cocaine with the intent to deliver where the defendant threw 1.8 grams of cocaine out his vehicle's window while he was being pulled over, and there was a "stack of cash" inside the vehicle, but no paraphernalia associated with the use of crack cocaine).

**Intent to deliver alprazolam**
However, we agree with the Defendants that the evidence was not sufficient to support the finding that they had the intent to deliver the alprazolam. The testimony at trial regarding their intent to deliver focused exclusively on the cocaine. No testimony was presented regarding the monetary value of eighteen and one-half tablets of alprazolam, or whether that is a relatively large amount for three individuals to possess for personal consumption. The testimony presented by the State and the Defendants showed that the pills could be consumed without the aid of any specific drug paraphernalia, and two of the Defendants testified that they had beverages and had already taken some of the pills that morning. We are disinclined therefore to find that the bare possession of eighteen and one-half tablets of alprazolam is sufficient evidence to support a finding of the intent to deliver beyond a reasonable doubt. See State v. John Fitzgerald Belew, No. W2002-01456-CCA-R3-CD, 2005 WL 885106, at *6 (Tenn. Crim. App., Jackson, April 18, 2005) (concluding that

possession of 2.2 grams of crack cocaine was not sufficient to establish the intent to deliver in absence of any testimony regarding the lack of paraphernalia, significance of the amount, packaging, street value, amount commonly possessed for personal consumption, or whether any amount of cash was found on the defendant's person).

### IV.    Closing Argument

The Defendants argue that the State's closing argument was not proper. They claim that the State attempted to mislead the jury by suggesting that the intent-to-deliver element in this case could be satisfied by finding a delivery between the Defendants themselves. Specifically, they assert that "the prosecutor's references to delivery of a pill to Defendant Haynie by the co-defendant's and further discussion of the [D]efendants being criminally responsible by all receiving a benefit by getting high confirms the State's attempt to confuse the jury regarding legal concepts." The portion of the State's closing argument with which the Defendants take umbrage is as follows:

> [W]e're not talking about a small amount like the Judge had talked about in his instruction for casual exchange. That's not the case here. We're talking a possession with intent to deliver, both on the cocaine and the [a]lprazolam. All three are criminally responsible in the fact that they all wanted to benefit from these drugs. The benefit could be in different ways, either money or getting a high. All three are going to get a benefit and that makes them all criminally responsible. Find them each guilty as they are charged.

Further, the Defendants contend that the following segment of the State's rebuttal argument in closing was improper:

> Criminal Responsibility. All three of them, in fact, are responsible for each other's conduct on December 2nd because they all knew what they were doing on that particular day and they all three were going to get a benefit out of this transaction. Whether it's to get high, to get money, whatever, all three were going to get a benefit out of this.

The Defendants admit that no contemporaneous objection was made to either of these statements at the trial, but they assert that the prosecutor's statements rise to the level of plain error.

The Defendants' failure to object during closing argument at trial waives our consideration of this issue on appeal. See Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App.1992) (holding that the defendant's failure to object to the State's alleged misconduct during closing argument waives that issue). As such, the Defendants are not entitled to relief on appeal unless the allegedly objectionable remarks constitute "plain error." See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(b); State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000). To determine whether an alleged trial error constitutes "plain error," we consider five factors:

(1) the record must clearly establish what occurred at trial; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the defendant did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." See State v. Adkisson, 899 S.W.2d 626, 641–42 (Tenn. Crim. App. 1994). Ultimately, the error must have "had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Id. at 642. "Moreover, to justify a reversal on the ground of improper argument of counsel, it must affirmatively appear that the improper conduct affected the verdict to the prejudice of the defendant." Anglin v. State, 553 S.W.2d 616, 622 (Tenn. Crim. App. 1977) (citing Hunter v. State, 440 S.W.2d 1 (1969)).

In consideration of these factors, we conclude that the State's remarks regarding the benefit the Defendants would receive from the drugs do not rise to the level of plain error in this case: the statements at issue did not undermine the fundamental fairness of the trial. Consequently, as the Defendants did not make a contemporaneous objection, this issue is waived on appeal.

## IV.     Legal Conclusion Testimony

Defendant Ouzts argues that the trial court erred by allowing Investigator Land to provide a legal conclusion regarding the definition of "delivery" during his testimony. Specifically, the Defendant contends that the following testimony provided by Investigator Land during redirect examination violated Rule 701 of the Tennessee Rules of Evidence:

Q.      If the defense attorneys had brought out about the paraphernalia [sic], when you actually deliver an amount of cocaine, marijuana or what other narcotic drug, aren't you just basically using your hands when you're doing a delivery?

A.      That's correct.

Q.      What other use are you doing [sic] when you're delivering to somebody else other than just your hands?

[Defense Counsel]:     Your Honor, May we approach?

The Court:     Yes Ma'am.

[Bench Conference]:

[Defense Counsel]: Your Honor, I'm going to object to the prosecutor asking what other use other than delivering drugs. I think the [c]ourt should be the one to give the definition on delivery.

[State]: Your Honor, these defense attorneys have all raised the issue of delivering and what type of paraphernalia was found. I was just

-19-

going into what the defense attorneys brought up as far as what they were using in delivering.

The Court: The objection will be overruled. The [c]ourt will allow the question.

[End Bench Conference]

Q.    Investigator Land, did you hear that last question?

A.    Could you repeat it for me?

Q.    Yes, sir. When individuals are delivering narcotics, can they not just take it from their hands to another person?

A.    Yes, they can.

Other than Tennessee Rule of Evidence 701, the Defendant does not cite any other authority in support of his argument. Because Investigator Land was never tendered as an expert witness, the admissibility of his opinion testimony is to be primarily judged by the standard set out in Rule 701 of the Tennessee Rules of Evidence. See State v. William Aubrey Trotter, No. 01C01-9701-CR-00019, 1998 WL 75423, at *4 (Tenn. Crim. App., Nashville, Feb. 24, 1998).

Tennessee Rule of Evidence 701 provides that a lay witness's opinion testimony is limited to opinions or inferences which are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." State v. Christopher Kevan Hein, No. E2003-01793-CCA-R3-CD, 2004 WL 1269304, at *9 (Tenn. Crim. App., Knoxville, June 9, 2004) (citing Tenn. R. Evid. 701(a)). Because it is the jury's duty to draw conclusions from the evidence presented, a "non-expert witness must ordinarily confine his testimony to a narration of facts based on first-hand knowledge and avoid stating mere personal opinions." State v. Middlebrooks, 840 S.W.2d 317, 330 (Tenn. 1992), superseded by statute on other grounds as recognized by State v. Stout, 46 S.W.3d 689 (Tenn. 2001).

Investigator Land's testimony that delivery of narcotics involves mainly the use of one's hands is not knowledge gained as a result of his experience in drug investigations. Even if the trial court's ruling admitting Investigator Land's statements on a narcotics "delivery" was improper, in our view, however, the testimony in question did little to strengthen the State's case. Because we have concluded that the evidence was insufficient to establish intent to deliver on his alprazolam conviction, this issue is moot as to that charge. Additionally, in light of the entire record, and specifically the other evidence embracing whether the Defendants intended to deliver the cocaine, we conclude that the admission of this testimony was harmless. See Hein, 2004 WL 1269304, at *9–10 (concluding that the testimony admitted in violation of Rule 701 was "harmless given the strength of the evidence against the defendant"); see also Tenn. R. App. P. 36(b) ("A final judgment

from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

## V.    Juror Bias

Lastly, Defendant Ouzts argues that he was denied an impartial jury in violation of his rights secured by the Sixth Amendment to the United States Constitution. The basis for his claim is that one of the jurors "had a history" with his own mother. He did not lodge an objection to the impartiality of this juror until his motion for a new trial.

Objections rooted in the bias of a juror or partiality towards a party are classified as propter affectum and may be made after the return of the verdict. Durham v. State, 188 S.W.2d 555, 559 (Tenn. 1945); State v. Furlough, 797 S.W.2d 631, 652 (Tenn. Crim. App. 1990). However, in order to gain relief by asserting such an argument, a Defendant must show that the juror at issue was biased. See Furlough, 797 S.W.2d at 653. In the present case, by simply stating that the juror "had a history" with his mother, Defendant Ouzts has not shown that the juror was biased. This issue is without merit.

## VI.    Error in Judgments - Judson F. Ouzts

We note an apparent error in the judgments of conviction entered against Defendant Ouzts. The Defendant was originally indicted as "Judson L. Ouzts." Prior to trial, Defendant Ouzts moved to dismiss the indictment because his correct name was "Judson F. Ouzts." The State then moved to amend the indictment to reflect the Defendant's correct name. The trial court granted the State's motion and ordered the indictment amended. In the body of the indictments in the record on appeal, the letter "F" was written in ink over the typed letter "L." However, when the judgments of conviction were entered, the judgment reflected the Defendant's name as "Judson L. Ouzts." Upon remand, the trial court should enter corrected judgments reflecting the correct name of Defendant Ouzts.[4]

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the trial court's judgment as to the cocaine conviction. Because we conclude that the evidence is insufficient to establish the Defendant's intent to deliver the alprazolam, we reverse the judgment entered on that conviction. We modify that conviction to simple possession. Accordingly, we remand for entry of new judgments of conviction for the lesser included offense of simple possession of alprazolam, see Tenn. Code Ann. § 39-17-418, and appropriate resentencing for each Defendant on that count. Also on remand, corrected judgments of conviction should be entered reflecting the correct name of the Defendant, Judson F. Ouzts.

---

[4] According to the transcript of the hearing, Judson L. Ouzts is the name of the Defendant's father.

_____
DAVID H. WELLES, JUDGE